GROSS, J.
In 2011, a beneficiary of a 1989 trust adopted a 27-year-old woman whom she had known since birth and treated like a daughter. The adoption impacted those who would inherit under the trust, so another beneficiary brought suit in Florida seeking to modify the trust to exclude the adoptee as a potential beneficiary. The circuit court granted summary judgment, excluding the 27 year old from becoming a beneficiary of the trust. We reverse because the issue of the settlor’s intent in creating the trust was not appropriately resolved on summary judgment.
Thomas Gordon Dennis (“the Settlor”) formulated a pour-over will, which provided that upon his death the assets of his estate would be marshaled into a trust for distribution (“the Trust”). Under the Trust, the balance of his estate that did not pass by specific bequest was to be split, with half the assets designated to the “Family Portion” of the Trust and the other half going to the “Marital Portion.” As their names indicate, the “Marital Portion” provided benefits for the Settlor’s spouse, while the “Family Portion” provided for his descendants.
The “Family Portion,” which is central to this appeal, is bifurcated into two sub-trusts: Family Trust A and Family Trust B. For the purposes of administration, the sub-trusts are similarly constructed. In both sub-trusts, the apportioned net assets are separated into equal shares among the Settlor’s five children, such that a child receives quarterly income installments throughout his or her lifetime, along with additional funding from the principal at the discretion of the trustee.
The difference between the sub-trusts lies in a child’s ability to devise his or her interest. Under Family Trust B, the Set-tlor’s children are provided with a general power to direct the apportioned trust assets following his or her death.[1] By con *15 trast, Family Trust A provides the children with no power of appointment, thus constraining distribution of the corpus to the Settlor’s “issue.”[2] As a result, under Family Trust A, once one of the Settlor’s children dies, that child’s net trust corpus is divided per stirpes amongst the child’s “issue”; however, if the child dies without “issue,” the trust assets disburse “sideways” to the Settlor’s other living children or his deceased children that are survived by “issue.”
Crucial to this case is the Trust’s definition of the term “issue.” The Trust, as amended and restated in 1992, contains express definitions of terms relevant to this case. Section XII(E) defines “issue” as “lineal descendants forever,” with the provision that “words of relationship in any degree includ[e] legally adopted persons.” Likewise, Section VIII of the Set-tlor’s 1992 pour-over will included adop-tees among its definition of “children” and identified “issue” as “those becoming so by adoption and those born or adopted after the execution of th[e] will.”

Controversy Leading to the Suit

At the time of his death, the Settlor was survived by five living children: (1) Appellant Dianna, (2) Appellee Harriet, (3) Lilia Anna Dennis, (4) James MacAlpin Dennis, and (5) Thomas Gordon Dennis, Jr. (hereinafter “Tom Jr.”). The Settlor knew at the time of the Trust’s formation that Tom Jr. was infertile. In his desire to have a family of his own, Tom Jr. adopted an infant.
Similar to Tom Jr., the Settlor knew that Dianna was unable to become pregnant due to her battle with Hodgkin’s disease. In 2011, thirteen years after the Settlor’s death, Dianna, a New Jersey resident, initiated a court proceeding in Pennsylvania to adopt a twenty-seven-year-old Pennsylvania resident who was living with her biological parents. Unlike Florida, Pennsylvania’s statutes do not require that financially interested parties be given notice of the proceedings, and the adoption was completed without objection.
At the adoption hearing, Dianna stated that she was the adoptee’s “godmother,” that she was close with the adoptee’s parents, that she “took care of [the adoptee] as a baby,” that she “paid for her college tuition,” and that she otherwise maintained a “close relationship” with her by “participating] in her life.” Identifying the reason for the adoption, Dianna detailed the contours of the Trust, explaining that since she was unable to have children of her own, she wanted her assets “to go to somebody that deserves them, for whom they will mean something.”

Procedural Posture

Believing that the adult adoption undermined the Settlor’s intent, Harriet filed a two-count complaint in the circuit court, challenging the adoptee’s status as a qualified beneficiary under the Trust. In her first count, Harriet asked the trial court to enter a declaratory judgment, which would construe the Trust to exclude adult adop-tees from becoming qualified beneficiaries as “living issue.” In the alternative, Harriet requested judicial modification of the Trust, which would exclude the adoptee from taking by conforming the Trust to the Settlor’s intent of keeping Family *16 Trust A’s assets within the family bloodlines.
In response, Dianna answered the complaint, filed two affirmative defenses, and moved to dismiss on the ground that there was no ambiguity as to the Trust’s inclusion of adopted children as beneficiaries. The trial court denied the motion to dismiss without elaboration.
After moving for a default judgment against the other qualified beneficiaries of the Trust,[3] Harriet moved for summary judgment on Count II, requesting modification or reformation of the Trust through the argument that by forming sub-trusts, it was clear that the Settlor intended for Family Trust A’s assets to remain within the “the family bloodline,” a concept that could be stretched only to the limits of infant adoption.[4],[5] Under such view, although the Settlor knew of Dianna’s unfortunate predicament when he drafted the Trust, he intentionally “did not provide for her to be able to effectively exercise a power of appointment by the means of an adult adoption.”
Two weeks later, Harriet also submitted a supplement to her motion for summary judgment, contending that the trial court should not give full faith and credit to the adoptee’s adoption since Pennsylvania’s adoption statutes contrast with Florida law in that they do not require notice of adoption to be given to financially interested parties. Additionally, Harriet asserted that Dianna breached her fiduciary duty as co-trustee by failing to make such disclosure to the beneficiaries of the Trust.
In response, Dianna filed a cross-motion for summary judgment on the declaratory relief count, requesting that the trial court find the- “adoption of [the adoptee] valid for purposes of her being” a qualified beneficiary. As to the allegations of Harriet’s motion, Dianna contended that the Settlor created Family Trust A not to limit inheritance to his bloodlines but “to take strategic advantage of tax benefits.” The affidavits and depositions submitted by both parties paint the following picture.

The Parties’ Affidavits

When the Settlor approached attorney William D. McEachern to draft the Trust instrument in question, his net worth was approximately fifteen to sixteen million dollars. Without elaborating on the purpose for creating Family Trust A, McEac-hern stated in a deposition that in 1992, the Settlor requested that he draft a restatement of the Trust to incorporate his desire to “include adopted persons” as “issue.” McEachern said that at the time of the Trust’s restatement, he did not contemplate an adult adoption and never broached the idea with the Settlor.
Addressing the issue of the Settlor’s intent, Dianna described in a deposition that when her father created the Trust, he was initially “anti-adoption” in his desire to maintain his “bloodlines” and “blood rules.” However, following Tom, Jr.’s adoption of an infant daughter, her father started to “come around” to the idea of adoption, resulting in the addition of the “adopteds” provision of the Trust.
*17 Harriet, on the other hand, described her father as “very conservative” and “old fashioned.” She stated that his intention in creating the Trust was to allow his assets to pass per stirpes, since it was desire “to provide this money for his family to go down the line.” Thus, while her father was initially opposed to Tom, Jr.’s adoption, he eventually agreed to modify the trust to include adopted children since “he had acknowledged [Tom, Jr.’s daughter] and wanted to make [sure] she also got [her] part” as a family member. Harriet did not discuss the concept of an adult adoption with her father.
Dianna’s Relationship with the Adult Adoptee[6]
Prior to the adoptee’s birth, Dianna was close friends with her biological parents; Dianna attended their wedding and was later chosen as the adoptee’s godmother. From the girl’s birth in 1984 until 1986, the girl’s parents shared a small apartment building as tenants with Dianna, during which period Dianna built a bond with the infant. Over the years, Dianna and the adoptee maintained their relationship; Dianna took the girl on a vacation and later assisted her college aspirations by paying for testing and funding a substantial portion of her college tuition.
When the adoptee was twelve years old, Dianna approached her biological parents regarding her desire to adopt the girl. Recognizing that this was a difficult decision, the girl’s parents decided to let her make her own decision once she reached the age of maturity. However, despite this prolonged relationship with Dianna, the adoptee never met the Settlor, was not otherwise included in Dennis family events, and maintained a healthy relationship with her biological parents.

The Trial Court’s Order

The trial court granted Harriet’s motion for summary judgment, modifying the trust to exclude the adoptee “because including her as issue would defeat or substantially impair the accomplishment of a material purpose of Trust ‘A’ which was to require the corpus of this Trust to remain in [the Settlor’s] family for generations to come.” In so ruling, the trial court gleaned the Settlor’s intent from the Trust itself, since “[t]he terms of the Trust show plainly on their face that [the Settlor] intended ... to ... carefully restrict ] the descent of Trust ‘A’.” Given such intent, the trial court found dispositive that there was “no evidence in the record to support any notion that [the Settlor] anticipated that 13 years after his death (and 22 years after he executed the Trust) that children would seek to divert the remainder interest in Trust ‘A’ away from his other children.” Additionally, as an independent ground to grant the motion, the trial court also stated that by not requiring notice to be given to financially interested parties, “the Pennsylvania adoption procedure is not sufficiently similar to Florida’s to support a construct of the Trust that would treat the adult adoptee as a beneficiary.”
I
The parties disagree about the legal status of adult adoptions in Florida. We first consider the public policy of Florida regarding adult adoptions, recognizing that the statutory method for adoption, whether for infants or adults, “is in derogation of the common law and must, therefore, be strictly construed.” In re Miller, 227 So.2d 73, 74 (Fla. 4th DCA 1969) (citation omitted).
*18 We agree with the fifth district that “[t]he public policy of Florida expressly permits the adoption of adults.” In re Adoption of Holland, 965 So.2d 1213, 1214 (Fla. 5th DCA 2007) (citing § 63.042(1), Fla. Stat. (2007)). Such policy is articulated through the wording of the Florida statutes, which provide, with minimal qualification, that any person, whether a minor or an adult, may be adopted. See § 63.042, Fla. Stat. (2011).[7]
In limited circumstances, the Legislature has codified its disapproval of certain adoptive relationships, exemplified by the limitation on adopting one’s spouse. See, e.g., § 63.042(2)(e), Fla. Stat. (2011) (stating that a married person may not adopt his or her spouse). However, unlike other states,[8] once a valid adoption has occurred, Florida makes no distinction as to the extent to which an adult adoptee may become a beneficiary in probate proceedings, nor does Florida set a line of demarcation as to whether the “policy” favoring adult adoption extends only to rights specifically identified by statute. In contrast, by way of illustration, Uniform Probate Code § 2-705 expressly limits an adult adoptee’s right to inherit through class gift provisions of wills and other governing instruments, stating as follows:[9]
(f) [Transferor Not Adoptive Parent.] In construing a dispositive provision of a transferor who is not the adoptive parent, an adoptee is not considered the child of the adoptive parent unless:
(1) the adoption took place before the adoptee reached [18] years of age;
(2) the adoptive parent was the adop-tee’s stepparent or foster parent; or
(3) the adoptive parent functioned as a parent of the adoptee before the adoptee reached [18] years of age.
Given the existence of UPC § 2-705, the Florida Legislature in 1974 had the opportunity to add such a provision when it “created the Florida Uniform Probate Code Study Commission” for the purpose of “considering] adoption of the Uniform Probate Code.” Basile v. Aldrich, 70 So.3d 682, 685 (Fla. 1st DCA 2011) (quoting Henry P. Trawick, Jr., Trawick’s Redfearn Wills & Admin. in Florida, § 1.2 (2010-11 ed.)), rev. granted, 103 So.3d 138 (Fla.2012). Following debate, however, the Legislature deemed the Florida Probate Act of 1933, which omitted such a provision, to be satisfactory, electing only to tailor our statutes to be “in the format of the Uniform Probate Code insofar as possible.” Id.
*19 As a result, current Florida probate statutes treat adopted persons, both young and adult, equally with their biological counterparts. See § 736.1102, Fla. Stat. (2011) (“The laws used to determine paternity and relationships for the purposes of intestate succession apply when determining whether class gift terminology and terms of relationship include adopted persons and persons born out of wedlock.” (emphasis added)). There is no statutory basis to preclude an adult adoptee from inheriting under a trust. Whether the adult adoption is in derogation of a set-tlor’s intent is an entirely separate issue.
 Against the weight of the statutory law, Harriet, nevertheless, requests this court to extend our case law by adopting a public policy which would create an impediment to an adult adoptee’s ability to inherit. “Public policy is the cornerstone-the foundation-of all constitutions, statutes and judicial decisions.... ” Knott v. State ex rel. Guar. Income Life Ins. Co., 136 Fla. 184, 186 So. 788, 795 (1939). Although not easily defined, public policy has been “ ‘said to be the community common sense and common conscience, extended and applied throughout the state to matters of public morals, public health, public safety, public welfare, and the like.’ ” Harris v. Gonzalez, 789 So.2d 405, 409 (Fla. 4th DCA 2001) (quoting City of Leesburg v. Ware, 113 Fla. 760, 153 So. 87, 89 (1934)). However, given the imprecision of the public policy concept, “[cjourts should be extremely cautious when called upon to declare a contract or provision thereof void on the ground of public policy.” France v. Liberty Mut. Ins. Co., 380 So.2d 1155, 1156 (Fla. 3d DCA 1980); see also Russell v. Martin, 88 So.2d 315, 317 (Fla.1956) (stating that a contractual document will not be invalidated on public policy grounds “unless it is injurious to the public or contravenes some settled social interest”). We decline Harriet’s request to invoke public policy in this case.
Undoubtedly, there are situations which render an adult adoption void, such as fraud upon the court. See, e.g., Goodman v. Goodman, - So.3d -, 2013 WL 1222944, 38 Fla. L. Weekly D696 (Fla. 3d DCA 2013) (invalidating an adult adoption where the adopting party committed fraud upon the court by failing to provide timely notice of adoption upon interested parties). For example, in Rickard v. McKesson, 774 So.2d 838, 839 (Fla. 4th DCA 2000), which was relied upon by the trial court, an eighty-eight-year-old childless man adopted his seventy-two-year-old homosexual partner to make the latter the beneficiary of a trust, depriving another of her beneficiary rights in the process. In invalidating the adoption, we found dispos-itive that the lovers committed a fraud upon the court, as the adoption amounted to nothing more than a “sham to enable [the adoptee] to inherit trust funds which should have gone to” the other. Id. at 841.
In Rickard, however, such a legal analysis was appropriate because the trust beneficiary sought invalidation of the adoption through Florida Rule of Civil Procedure 1.540(b), which permits the “court to entertain an independent action to relieve a party from a judgment, decree, order, or proceeding or to set aside a judgment or decree for fraud upon the court.” Here, on the other hand, Harriet failed to make such a request to the Florida court, presumably since Pennsylvania maintains jurisdiction over the adoption. Rather, her request to modify the Trust dealt not with the validity of the adoption itself, but whether it conformed with the Settlor’s intent.
In sum, the application of public policy has no part in this case. As illustrated by the cases cited by Harriet, the proper focus of the proceeding below is on the *20 Settlor’s intent. See Cross v. Cross, 177 Ill.App.3d 588, 126 Ill.Dec. 801, 532 N.E.2d 486, 488-89 (1988) (preventing an adult adoptee from becoming a beneficiary under a trust where the settlor’s son, who was granted a power of appointment in favor of his mother’s “descendants,” thwarted his mother’s intent by initiating the adoption for the sole purpose of allowing the adoptee to take under the trust); Minary v. Citizens Fid. Bank & Trust Co., 419 S.W.2d 340, 343 (1967) (describing the question of whether an adult adoptee should inherit as “a situation wherein we must choose between carrying out the intent of deceased testators or giving a strict and rigid construction to a statute which thwarts that intent” (emphasis added)); In re Nowels Estate, 128 Mich.App. 174, 339 N.W.2d 861, 866 (1983) (disinheriting an adult adoptee where “it would have been [the testatrix’s] probable desire and intent that the adult adopted son should not take”); Matter of Nicol’s Estate, 152 N.J.Super. 308, 377 A.2d 1201, 1207 (1977) (disinheriting an adult adoptee where such adult adoption would be outside of the testator’s contemplation and contrary to the testator’s probable intent).
II
Finding imposition of a judge-imposed version of public policy inappropriate, we next address the propriety of the trial court’s decision to grant summary judgment. “ ‘The standard of review of an order granting summary judgment is de novo.’ ” Corya v. Sanders, 76 So.3d 31, 33 (Fla. 4th DCA 2011) (quoting Fini v. Glascoe, 936 So.2d 52, 54 (Fla. 4th DCA 2006)). “When reviewing a ruling on summary judgment, an appellate court must examine the record in the light most favorable to the non-moving party.” Id. “ ‘If the record reflects the existence of any genuine issue of material fact, or the possibility of any issue, or if the record raises even the slightest doubt that an issue might exist, summary judgment is improper.’ ” Shaw v. Tampa Elec. Co., 949 So.2d 1066, 1069 (Fla. 2d DCA 2007) (quoting Snyder v. Cheezem Dev. Corp., 373 So.2d 719, 720 (Fla. 2d DCA 1979)).
Section 736.04113, Florida Statutes (2011), provides the legal framework for Harriet’s action. Section 736.04113(1)(b) authorizes a court to modify the terms of an irrevocable trust where “[b]ecause of circumstances not anticipated by the set-tlor, compliance with the terms of the trust would defeat or substantially impair the accomplishment of a material purpose of the trust.” If such grounds are established, a court is authorized to modify the trust by, among other things, “[a]mend[ing] or changing] the terms of the trust, including terms governing distribution of the trust income or principal or terms governing administration of the trust.” § 736.04113(2)(a), Fla. Stat. (2011). As for the evidence that a court should consider in an action under section 736.04113, subsection (3)(a) provides,
In exercising discretion to modify a trust under this section:
(a) The court shall consider the terms and purposes of the trust, the facts and circumstances surrounding the creation of the trust, and extrinsic evidence relevant to the proposed modification.
The fact issue that controls this case is the Settlor’s intent in creating the Trust. Generally, the intent of a party in creating a document is “ ‘a question of fact that should not be decided on a summary judgment.’ ” Hodge v. Cichon, 78 So.3d 719, 723 (Fla. 5th DCA 2012) (quoting Sanders v. Wausau Underwriters Ins. Co., 392 So.2d 343, 345 (Fla. 5th DCA 1981)). Here, the terms of the Trust unambiguously place no limitations on a “legally *21 adopted” person becoming a beneficiary under the Trust.
Absent any provision to the contrary, where a trust is created and executed in Florida, the law presumes that the settlor expected Florida law to apply and Florida law permits adult adoptions. See Strochak v. Fed. Ins. Co., 717 So.2d 453, 454-55 (Fla.1998) (applying presumption to Florida insurance policy). To overcome this presumption, Harriet must establish the existence of a latent ambiguity in the trust which occurs “where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings.” Barnwell v. Miami-Dade Cnty. Sch. Bd., 48 So.3d 144, 145-46 (Fla. 1st DCA 2010) (citation omitted).
The lawyer who drafted the Trust did not discuss adult adoptions with the Settlor. In the absence of ironclad evidence of the Settlor’s express declaration of opposition to adult adoptions, the Set-tlor’s intent turns on the credibility of witnesses, the weight to be given to their testimony, and the subtle nuances of the Settlor’s beliefs about the significance of family bloodlines. Whether this adult adoption “substantially impair[s] the accomplishment of a material purpose of the trust” is an issue inappropriate for resolution on summary judgment. § 736.04113(l)(b), Fla. Stat. (2011).
Ill
Finally, Dianna challenges the trial court’s finding that Pennsylvania’s adoption laws, due to lack of notice to financially interested parties, should not be given full faith and credit in Florida. Under the Full Faith and Credit Clause, “[c]ourts in every jurisdiction are required to give judgments entered in sister states the full faith and credit of the law.” In re Estate of O’Keefe, 833 So.2d 157, 160 (Fla. 2d DCA 2002) (citations omitted). “To give full faith and credit to a foreign judgment is to give it the same effect that the foreign state would have given it.” Atwell v. Atwell, 730 So.2d 858, 860 (Fla. 1st DCA 1999). As the second district has explained:
In interpreting the Full Faith and Credit Clause, the United States Supreme Court has held that “[a] final judgment in one State, if rendered by a court with adjudicatory authority over the subject matter and persons governed by the judgment, qualifies for recognition throughout the land.” Baker v. Gen. Motors Corp., 522 U.S. 222, 233, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998). Further, the Court held that there are no public policy exceptions to the full faith and credit which is due to judgments entered in another state. Id.
Embry v. Ryan, 11 So.3d 408, 409-10 (Fla. 2d DCA 2009). Thus, “[w]here a party has had notice and opportunity to be heard and the foreign court has satisfied Florida’s jurisdictional and due process requirements their orders will be entitled to comity.” Nahar v. Nahar, 656 So.2d 225, 230 (Fla. 3d DCA 1995) (footnote omitted); see also Finstuen v. Crutcher, 496 F.3d 1139, 1141 (10th Cir.2007) (“We hold that final adoption orders by a state court of competent jurisdiction are judgments that must be given full faith and credit under the Constitution by every other state in the nation.”).
Section 63.192, Florida Statutes (2011), provides that Florida courts must recognize the adoption decrees of other states:
A judgment ... establishing the relationship [of parent and child] by adoption ... issued pursuant to due process of law by a court or authorized body of *22 any other jurisdiction within or without the United States shall be recognized in this state, and the rights and obligations of the parties shall be determined as though the judgment or decree were issued by a court of this state.
(Emphasis added).
Although rare, an exception to this blanket rule exists where the laws governing the adoption in the foreign state are so different as to be “repugnant to the laws or policy of the state of Florida upon the subject.” Mott v. First Nat’l Bank of St. Petersburg, 98 Fla. 444, 124 So. 36, 37 (1929) (citations omitted); see also Harris Inv. Co. v. Hood, 123 Fla. 598, 167 So. 25, 29 (1936) (describing the exception to the full faith and credit clause for a conflict in public policy as “narrow”). However, “[lightweight contrary policies in one state will not counterbalance the top-heavy compulsion of the full faith and credit clause of the federal constitution to observe and enforce the judgments of another state.” State of Minn. v. Taran, 164 So.2d 893, 894 (Fla. 3d DCA 1964).
A “repugnant” policy or law is a serious departure from core Florida values. By way of example, in Kupec v. Cooper, 593 So.2d 1176, 1178 (Fla. 5th DCA 1992), cited by the trial court, the fifth district declined to give full faith and credit for a German adoption since the “adoption” consisted only of obtaining a new birth certificate without judgment by a court of law. Likewise, in Tsilidis v. Pedakis, 132 So.2d 9, 13 (Fla. 1st DCA 1961), the first district chose not to acknowledge a Greek adoption of an adult since the type of adoption employed was expressly prohibited under Florida law at the time.
In the case at hand, Pennsylvania’s adoption statute procedurally differs from Florida law in that notice is not required to be given to financially interested parties. See 23 Pa.C.S.A. § 2713.[10] Section 63.182(2)(a), Florida Statutes (2011), sets the notice requirements for persons other than those “expressly entitled to be given notice of an adoption” under Chapter 63, stating:
[ T]he interest that entitles a person to notice of an adoption must be direct, financial, and immediate, and the person must show that he or she will gain or lose by the direct legal operation and effect of the judgment. A showing of an indirect, inconsequential, or contingent interest is wholly inadequate, and a person with this indirect interest lacks standing to set aside a judgment of adoption.
Even under Florida’s statute, Harriet would not have been entitled to notice of the Pennsylvania adoption, since she did not stand to “gain or lose by the direct legal operation and effect of the judgment.” Id. Harriet would be entitled to inherit a portion of Dianna’s share upon Dianna’s death only if Dianna is not survived by “issue” within the meaning of the Trust. Harriet’s interest is thus “indirect, inconsequential, or contingent” within the meaning of the statute.
Harriet’s indirect and contingent interest in the Pennsylvania adoption contrasts sharply with the significant interest of the settlor’s children in Goodman, - So.3d *23 -, 2013 WL 1222944, 38 Fla. L. Weekly D696. In that case, the settlor’s children were beneficiaries of an irrevocable trust, which provided that all of the settlor’s children were “to share equally in the corpus of the trust.” Id. at *1. The settlor later adopted his 42-year-old girlfriend, the effect of which was to immediately give the girlfriend “a $5 million testamentary power of appointment ... and continued distributions throughout her lifetime, valued at an estimated $8.75 million.” Id. The third district held that the children were entitled to notice under section 63.182(2)(a) because the girlfriend adoption “directly, immediately, and financially impacted the children” by decreasing their interest in the trust “from one-half to one-third.” Id. at *2-3. As a result of the failure to give the notice required by statute, the third district reversed the adoption judgment. Id. at *4.
Where Harriet would not have been entitled to notice of the adoption even under Florida’s statute, it can hardly be said that Pennsylvania’s adoption procedure is so “repugnant” that the adoption is not entitled to full faith and credit in Florida. Moreover, Pennsylvania’s absence of notice requirements for persons with a direct financial interest in an adoption does not render Pennsylvania’s adoption practice “repugnant” to Florida. A state’s different view of which parties are proper or necessary in a lawsuit is not a basis for denying full faith and credit to that state’s judgment. See, e.g., Taran, 164 So.2d at 895 (“The fact that Florida may have a different rule with reference to such immunity from process in proceedings initiated in this state is not of itself a reason to reject as unworthy of full faith and credit a judgment of a sister state whose holding is otherwise.” (footnote omitted)); Boardwalk Regency Corp. v. Hornstein, 695 So.2d 471, 471 (Fla. 4th DCA 1997) (holding that “Florida courts are obligated by the Full Faith and Credit Clause to recognize judgments which have been validly rendered in the courts of sister states, including those based on gambling debts”).
The final judgment is reversed and remanded to the circuit court for further proceedings.
WARNER and LEVINE, JJ., concur.

. Applicable to Family Trust B, Article VII(B)(2) provides:
Upon the death of my child, the then remaining net trust assets shall be distributed pursuant to the exercise of that general power of appointment set forth in Subpara-graph (2)(b), below, and in default of a valid exercise of said general power of appoint *15 ment, the remaining net trust assets shall be divided in shares for my child’s then living issue, per stirpes ...

. Applicable to Family Trust A, Article VI(B)(2) provides:
Upon the death of my child, the then remaining net trust assets shall be divided in shares for my child’s then living issue, per stirpes ...

. The default judgments were eventually entered once the beneficiaries failed to respond.

. Under this view, by creating Family Trust, the Settlor "expressed a clear intent ... to give each of his children the power to divert a portion of the child’s share outside of the family bloodline through a testamentary power of appointment.”

.Furthermore, the motion contended that the Settlor "was an inflexible, politically incorrect individual who did not welcome strangers into his family.” Therefore, the motion asserted that Family Trust A was created not for tax purposes, but to maintain wealth within the Settlor’s lineage.

. As Dianna argues, the nature of Dianna’s relationship with the adoptee is relevant to show that the Settlor would have "fully supported and embraced the adoptee” had he known of the adoption.

. Section 63.042(1), Florida Statutes (2011) provides that "[a]ny person, a minor or an adult, may be adopted.”

. For example, some states specifically prohibit adult adoptions motivated by inheritance objections. See, e.g., Ala.Code § 26-1OA-6 cmt. (2011) ("Adult adoptions for inheritance purposes provided for in ... the Alabama Code [were] repealed.”). Likewise, "[o]ther states distinguish between adult and minor adoptees under state intentestacy and glass gift laws.” Sarah Ratliff, Adult Adoption: Intestate Succession and Class Gifts Under the Uniform Probate Code, 105 Nw. U.L.Rev. 1777, 1792 & n. 132 (2011) (citing Ind.Code § 29-l-6-l(d) (2011) as an example). Additionally, other states, such as New Jersey, set age restrictions such that adult adoptions "shall not be granted, unless the adopting parent or parents are at least 10 years older than the person to be adopted." See N.J. Stat. Ann. § 2A:22-2 (West 2011).

.The previous version of UPC § 2-705 provided as follows:
(c) In addition to the requirements of subsection (a), in construing a donative disposition by a transferor who is not the adopting parent, an adopted individual is not considered the child of the adopting parent unless the adopted individual lived while a minor, either before or after the adoption, as a regular member of the household of the adopting parent.

. This statute provides:
The court, in its discretion, may dispense with consents other than that of the adoptee to a petition for adoption when:
(1) the adoptee is over 18 years of age; or
(2) the adoptee is under 18 years of age and has no parent living whose consent is required.
23 Pa.C.S.A. § 2713.